JOHNSON & WEAVER, LLP
FRANK J. JOHNSON (174882)
frankj@johnsonandweaver.com
NATHAN R. HAMLER (227765)
nathanh@johnsonandweaver.com
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone:  (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE E. ROLLINS, Derivatively on Behalf of Nominal Defendant INVENSENSE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BEHROOZ ABDI, ALAN KROCK, JON OLSON, AMIT SHAH, ERIC STANG, TIMOTHY WILSON, and YUNBEI YU, <br><br> Defendants, <br><br> and <br><br> INVENSENSE, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No. _____ <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT <br><br> <u>DEMAND FOR JURY TRIAL</u> |

1   Plaintiff, George E. Rollins ("Plaintiff"), by and through his undersigned counsel, hereby

2   submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of

3   InvenSense, Inc. ("InvenSense" or the "Company") and against certain current and former

4   officers and directors of the Company for breaches of fiduciary duties, unjust enrichment,

5   corporate waste, and breach of fiduciary duty for inside selling and misappropriation of

6   information.  Plaintiff makes these allegations upon personal knowledge as to those allegations

7   concerning Plaintiff and, as to all other matters, upon information and belief derived from the

8   investigation of counsel, which included, without limitation: a) review and analysis of public

9   filings made by InvenSense and other related parties and non-parties with the U.S. Securities and

10   Exchange Commission ("SEC"); b) review and analysis of press releases and other publications

11   which the Individual Defendants (defined herein) caused the Company to disseminate or that

12   were disseminated by other related non-parties; c) review of news articles, shareholder

13   communications, and postings on InvenSense's website concerning the Company's public

14   statements; d) pleadings, papers, and any documents filed with and publicly available from the

15   related pending securities fraud class action, *McMillan v. InvenSense, Inc. et al.*, No. 3:15-cv-

16   00084 (N.D. Cal.) (the "Securities Class Action"); and e) review of other publicly available

17   information concerning InvenSense and the Individual Defendants (defined herein).

## NATURE OF THE ACTION

19   1.   This is a shareholder derivative action brought on behalf and for the benefit of

20   nominal defendant InvenSense against certain current and former officers and directors of the

21   Company.

22   2.   Since at least July 29, 2014 through and including at least October 28, 2014 (the

23   "Relevant Period"), the Individual Defendants breached their fiduciary duties and committed

24   other violations of law by, *inter alia*, causing the Company to issue materially false and

25   misleading statements and/or omit material information from its public filings and in

26   communications with analysts and investors the disclosure of which would have made such

27   filings and communications not misleading.   By and through the Individual Defendants'

28   violations of law, the Company has sustained and will sustain damages.

3.      Nominal Defendant InvenSense designs, develops, markets, and sells Micro-Electro-Mechanical Systems ("MEMS") sensors, such as accelerometers, gyroscopes, and microphones for consumer electronics.   The Company targets sales of its products to manufacturers of smartphones and tablets, console and portable video gaming devices, and other types of consumer electronics.  The Company was founded in 2003.

4.      InvenSense's ability to secure new customers depends on winning competitive processes, known as "design wins."  As the Company acknowledges, "[t]hese selection processes are typically lengthy" and the "sales cycle for [its] products is long."  Due to the technical nature and need for close product integration between its MEMS sensors and its customer's products, InvenSense works closely with its customers both before and after a design win.

5.      Prior to the Relevant Period, InvenSense developed relationships with leading electronics and mobile device manufacturers, including Samsung Electronics ("Samsung") and LG Electronics ("LG").  Even though InvenSense may have supplied chips to these leading electronics and mobile device manufacturers, the Company had yet to announce a relationship with Apple, Inc. ("Apple") – which is thought to be the "holy grail" of mobile device manufacturers for companies like InvenSense looking to have their technology integrated into Apple's products.

6.      Indeed, Apple is well known for its meticulous planning of products and for its policies on not revealing products until they are finished, polished, and ready for distribution to customers.  As such, due to the highly secretive nature of the way Apple does business, the Company was not permitted to reveal to investors that its sensors would be used in the new and highly anticipated iPhone 6.

7.      However, during early to mid-2014, based on statements by the Company and rumors from well-respected sources, investors and analysts became confident that InvenSense had finally secured a design win with Apple for its next blockbuster product, the iPhone 6 mobile phone.  It was ultimately revealed during September 2014 that InvenSense's sensors were in fact included in the iPhone 6.  Of course, that also meant that the Company worked closely with Apple and agreed upon key contractual terms prior to the start of the Relevant Period.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 2 -

8.     On July 29, 2014, the Individual Defendants caused InvenSense to announce financial results for the quarter ended June 29, 2014, provide guidance for the next several quarters, and make extremely positive statements about the condition of its business and near term prospects.

9.     Although the Individual Defendants may not have caused the Company to specifically reference Apple or the iPhone 6 by name, the statements they caused the Company to make during the Relevant Period left no doubt that InvenSense sensors would be included in the iPhone 6 and that the Company's near term guidance included a substantial amount of sales related to that specific product.  Importantly, not only did the Individual Defendants cause the Company to issue strong sales guidance, but they also caused it to represent to investors that the Company's margins would be consistent with the recent past.  This left investors with the false view that the Company had huge sales opportunities without a negative impact on margins or profitability.

10.     On October 28, 2014, the Individual Defendants caused the Company to announce disappointing financial results for the quarter ended September 28, 2014.  Specifically, the Individual Defendants caused the Company to disclose that it had a substantial drop-off in margins due in large part to low pricing for Apple and Samsung, operational inefficiencies with the iPhone 6 rollout, and a charge related to old inventory.

11.     This news caused the price of InvenSense stock to swoon as shares plummeted from a closing price of $21.48 on October 28, 2014 to close at $16.08 on October 29, 2014 – a decrease of more than 25% in one day, wiping out more than $450 million in market capitalization.

12.     Indeed, instead of revealing the true condition of the Company and its prospects, the Individual Defendants caused the Company to hide these facts from investors and chose instead to issue strong guidance and paint a picture of a bright future, one with Apple secured as a customer, causing InvenSense stock to trade at inflated levels during the Relevant Period. However, after the above revelations seeped into the market, the price of InvenSense stock was

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 3 -

1  hammered by massive sales, sending it down significantly, and causing significant harm to

2  shareholders and erosion in the Company's market capitalization.

3       13.    Not everyone was harmed though.  While the price of InvenSense stock was

4  inflated, several of the Individual Defendants were able to capitalize on inside, non-public

5  information, disposing of more than 187,000 shares of InvenSense stock for proceeds exceeding

6  $4.6 million.

7       14.    The true facts, which were known, recklessly disregarded, or with the exercise of

8  due care and due diligence reasonably should have been known by the Individual Defendants,

9  and which were concealed from the investing public during the Relevant Period, were as follows:

10  (a) even though InvenSense sensors would be included in the iPhone 6, Apple was given an

11  aggressive deal on pricing, and the low price point for Apple, along with lower than average

12  pricing for another InvenSense customer, Samsung, negatively impacted the Company's

13  profitability; (b) the Company encountered manufacturing inefficiencies associated with the

14  development and rollout of the iPhone 6 since it was a new product; (c)  InvenSense held a large

15  stockpile of old inventory that needed to be written off due to lack of demand; and (d) based on

16  the foregoing, there was no reasonable basis for the Individual Defendants to portray the

17  Company as having huge sales opportunities without any negative impact on margins and

18  profitability during the Relevant Period.

19       15.    InvenSense's Board of Directors ("Board") has not commenced (and will not

20  commence) litigation against the Individual Defendants, let alone vigorously prosecute such

21  claims, because they face a substantial likelihood of liability to InvenSense for making,

22  authorizing, and/or failing to timely correct the false and misleading statements alleged herein,

23  and/or for failing to implement, maintain, or follow (or take reasonable steps to cause the

24  Company's officers to follow) adequate internal controls.  Accordingly, a pre-suit demand upon

25  the Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate

26  InvenSense's rights against its wayward fiduciaries and hold them responsible for the damages

27  they have caused InvenSense.  More specifically, Plaintiff brings this derivative action to, among

28  other things, recover damages including, but not limited to, fees and costs associated with the

1  pending Securities Class Action, loss of goodwill and business opportunities, and loss in market

2  value and shareholder equity, caused by the Individual Defendants' unlawful course of conduct

3  and breaches of fiduciary duty and to require the implementation of certain corporate reforms and

4  improved corporate governance and internal procedures to protect InvenSense and its

5  shareholders from a repeat of the damaging events described herein.

6                                    **JURISDICTION AND VENUE**

7           16.     The Court has jurisdiction over all claims under 28 U.S.C. §1332 because there is

8  complete diversity among the parties and the amount in controversy exceeds the sum of $75,000,

9  exclusive of interest and costs.   This action is not a collusive action designed to confer

10 jurisdiction on a court of the United States that it would not otherwise have.

11          17.     The Court has jurisdiction over each defendant because each defendant is either a

12 corporation that does sufficient business in California, or is an individual who has sufficient

13 minimum contacts with California so as to render the exercise of jurisdiction by the California

14 courts permissible under traditional notions of fair play and substantial justice.

15          18.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because one or more

16 of the defendants either resides in or maintains executive offices in this District, including

17 Nominal Defendant InvenSense, a substantial portion of the transactions and wrongs complained

18 of herein – including the Individual Defendants' primary participation in the wrongful acts

19 detailed herein and aiding and abetting in violations of fiduciary duties owed to InvenSense –

20 occurred in this District, and the Individual Defendants have received substantial compensation

21 in this District by doing business here and engaging in numerous activities that had an effect in

22 this District.

23          19.     In connection with the acts and conduct alleged herein, defendants, directly and

24 indirectly, used the means and instrumentalities of interstate commerce, including, but not

25 limited to, the United States mails, interstate telephone communications, and the facilities of the

26 national securities exchanges and markets.

27

28

## PARTIES

20.     Plaintiff has continuously held shares of InvenSense common stock at all relevant times including prior to and during the Relevant Period, and continues to hold InvenSense common stock.  Plaintiff is a citizen of Maine.

21.     Nominal Defendant InvenSense is incorporated in Delaware with its principal place of business located at 1745 Technology Drive, Suite 200, San Jose, California 95110. InvenSense, founded in 2003, designs, develops, markets, and sells MEMS gyroscopes for motion tracking devices in consumer electronics, including smartphones and tablets, console and portable video gaming devices, digital still and video cameras, smart TVs, navigation devices, toys, and health and fitness accessories.  The Company's stock is traded on the NYSE under the ticker symbol "INVN."  The Company has more than 90 million shares outstanding.

22.     Defendant Behrooz Abdi ("Abdi") has served as the Company's Chief Executive Officer ("CEO") since October 2012 and has served as a director on the Company's board of directors since June 2011.  Abdi is a Class III director with his term expiring at InvenSense's 2017 annual meeting of stockholders, with his reelection to the Board secured at the Company's most recent stockholder meeting held on September 12, 2014.  According to the Company's most recent Proxy filed with the SEC on or about July 25, 2014, Abdi received $589,361 in total compensation during the fiscal year ended March 30, 2014 and $6,527,150 in total compensation in 2013 from InvenSense.  Abdi is a citizen of California.

23.     Defendant Alan Krock ("Krock") served as the Company's Vice President and Chief Financial Officer ("CFO") from May 2011 until his resignation on September 2, 2014. According to the Company's most recent Proxy filed with the SEC on or about July 25, 2014, Krock received $1,530,794 in total compensation during the fiscal year ended March 30, 2014, $271,745 in total compensation in 2013, and $2,137,305 in total compensation in 2012 from InvenSense.  Additionally, Krock received a severance of $175,000 and a consulting fee of $25,000 per month for September and October 2014 upon his departure as CFO from the Company.  Further, during the Relevant Period, while in possession of material, adverse information regarding the Company's financial performance and outlook, Krock sold

1 126,666 shares of InvenSense common stock for proceeds of $3,173,650 at inflated prices.

2 Krock is a citizen of California.

3     24.    Defendant Jon Olson ("Olson") has been a director of the Company since October

4 2011.  Olson is a Class I director with his term expiring at InvenSense's 2015 annual meeting of

5 stockholders.  According to the Company's most recent Proxy filed with the SEC on or about

6 July 25, 2014, Olson received $176,584 in total compensation during the fiscal year ended

7 March 30, 2014 from InvenSense for serving on the Board.  During the Relevant Period, Olson

8 served as Chairperson of the Audit Committee.  Olson is a citizen of California.

9     25.    Defendant Amit Shah ("Shah") has been a director of the Company since April

10 2004.  During the Relevant Period, Shah served as Chairman of the Board, a position he still

11 holds.  Shah is a Class I director with his term expiring at InvenSense's 2015 annual meeting of

12 stockholders.  According to the Company's most recent Proxy filed with the SEC on or about

13 July 25, 2014, Shah received $71,771 in total compensation during the fiscal year ended March

14 30, 2014 from InvenSense for serving on the Board.  Additionally, during the Relevant Period,

15 while in possession of material, adverse information regarding the Company's financial

16 performance and outlook, Shah sold 22,213 shares of InvenSense common stock for proceeds of

17 $545,001 at inflated prices.  In addition to serving as Chairperson of the Board, Shah served as

18 Chairperson of the Compensation Committee during the Relevant Period.  Shah is a citizen of

19 California.

20     26.    Defendant Eric Stang ("Stang") has been a director of the Company since

21 September 2013.  Stang is a Class III director with his term expiring at InvenSense's 2017

22 annual meeting of stockholders, with his reelection to the Board secured at the Company's most

23 recent stockholder meeting held on September 12, 2014.  According to the Company's most

24 recent Proxy filed with the SEC on or about July 25, 2014, Stang received $624,731 in total

25 compensation during the fiscal year ended March 30, 2014 from InvenSense for serving on the

26 Board.  During the Relevant Period, Stang was a member of the Audit, Compensation, and

27 Nominating and Corporate Governance Committees.  Currently, Stang is a member of the

28

Compensation and Nominating and Corporate Governance Committees.  Stang is a citizen of California.

27.    Defendant Timothy Wilson ("Wilson") has been a director of the Company since April 2004.  Wilson is a Class II director with his term expiring at InvenSense's 2016 annual meeting of stockholders.  According to the Company's most recent Proxy filed with the SEC on or about July 25, 2014, Wilson received $71,771 in total compensation during the fiscal year ended March 30, 2014 from InvenSense for serving on the Board.  Additionally, during the Relevant Period, while in possession of material, adverse information regarding the Company's financial performance and outlook, Wilson sold 38,808 shares of InvenSense common stock for proceeds of $895,301 at inflated prices.  During the Relevant Period, Wilson served on the Audit Committee and as Chairperson of the Nominating and Corporate Governance Committee.  Wilson is a citizen of California.

28.    Defendant Yunbei "Ben" Yu ("Yu") has been a director of the Company since March 2008.  Yu is a Class I director with his term expiring at InvenSense's 2015 annual meeting of stockholders.  According to the Company's most recent Proxy filed with the SEC on or about July 25, 2014, Yu received $165,293 in total compensation during the fiscal year ended March 30, 2014 from InvenSense for serving on the Board.  During the Relevant Period, Yu served as a member of the Compensation Committee.  Yu is a citizen of California.

29.    Defendants identified in ¶¶20-26 are sometimes referred to collectively herein as the "Individual Defendants."  Defendants identified in ¶¶20, 22-26 are sometimes referred to collectively herein as the "Director Defendants."  Defendants identified in ¶¶22, 24, and 25 are sometimes referred to collectively herein as the "Audit Committee Defendants."  Defendants identified in ¶¶21, 23, 25 are sometimes referred to collectively herein as the "Insider Selling Defendants."

30.    As directors and/or officers of InvenSense, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known the adverse, non-public information about InvenSense's  business, prospects, and outlook, including the adverse information regarding the Company's financial performance and margin

1  compression, because of their access to internal corporate documents, conversations, and

2  connections with one another as well as other corporate officers and employees, attendance at

3  Board meetings, and committee meetings thereof, as well as reports and other information

4  provided to them in connection therewith.   The Individual Defendants either participated in,

5  caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon

6  InvenSense through the issuance of the improper statements disseminated via press releases,

7  SEC filings, and other means to the press, securities analysts, and InvenSense shareholders.

8  **FACTUAL ALLEGATIONS**

9     *Background*

10     31.     InvenSense designs, develops, markets, and sells MEMS sensors, such as

11  accelerometers, gyroscopes, and microphones for consumer electronics.   The Company targets

12  sales of its products to manufacturers of smartphones and tablets, console and portable video

13  gaming devices, and other types of consumer electronics.   The Company was founded in 2003.

14     32.     InvenSense's ability to secure new customers depends on winning competitive

15  processes, known as "design wins."   As the Company acknowledges, "[t]hese selection processes

16  are typically lengthy" and the "sales cycle for [its] products is long."   Due to the technical nature

17  and need for close product integration between its MEMS sensors and its customer's products,

18  InvenSense works closely with its customers both before and after a design win.

19     33.     Prior to the Relevant Period, InvenSense developed relationships with leading

20  electronics and mobile device manufacturers, including Samsung and LG.   Even though

21  InvenSense may have supplied chips to these leading electronics and mobile device

22  manufacturers, the Company had yet to announce a relationship with Apple – which is

23  considered to be the "holy grail" of mobile device manufacturers for companies like InvenSense

24  looking to have their technology integrated into Apple's products.

25     34.     Indeed, Apple is well known for its meticulous planning of products and for its

26  policies on not revealing products until they are finished, polished, and ready for distribution to

27  customers.   As such, due to the highly secretive nature of the way Apple does business, the

28

1  Company was not permitted to reveal to investors that its sensors would be used in the new and

2  highly anticipated iPhone 6.

3          35.     However, during early to mid-2014, based on statements by the Company and

4  rumors from well-respected sources, investors and analysts became confident that InvenSense

5  had finally secured a design win with Apple for its next blockbuster product, the iPhone 6 mobile

6  phone.  It was ultimately revealed during September 2014 that InvenSense's sensors were in fact

7  included in the iPhone 6.  Of course, that also meant that the Company worked closely with

8  Apple and agreed upon key contractual terms prior to the start of the Relevant Period.

9          ***Improper Statements***[1]

10          36.     On July 29, 2014, the Individual Defendants caused the Company to issue a press

11  release announcing its financial results for its first fiscal quarter of 2015 for the period ended

12  June 29, 2014.  For the quarter, the Company reported net revenue of $66.7 million, a net loss of

13  $4.8 million, or ($.05) per share, and gross profit of $31.17 million.

14          37.     In the press release, Abdi commented on the "exciting and promising time for

15  InvenSense" and the "market share increases" due to the growth of the Company's "design win

16  portfolio," stating, in pertinent part, as follows:

17              This is an exciting and promising time for InvenSense . . . ***Our design win
                portfolio continues to grow, positioning us for strong market share increases in
18              the coming quarters as new designs ramp into volume production***.  We continue
                to transition to a platform solution company, underscored by our announcement
19              earlier this quarter of our intention to acquire two leading sensor algorithm and
                software companies.  These highly strategic acquisitions allow us to scale our
20              research and development efforts in this area and deliver higher value solutions to
                our customers.  In total, our expanding presence in key geographic markets,
21              additional content opportunities within the mobile device market and new
                applications for motion and audio sensors, such as wearables, provide healthy
22              growth drivers through the current fiscal year and beyond.

23          38.     Later that evening, the Individual Defendants caused the Company to hold a

24  conference call with analysts and investors to discuss the earnings announcement and the

25  Company's operations.  During the call, the financial results from the press release were

26

27

28  _____
    [1]     All emphasis is added unless otherwise noted.

1  reiterated and additional positive statements about InvenSense, its business, earnings, and

2  operations were made.

3          39.      Specifically, during the call, Abdi discussed the exciting opportunities expected in

4  the near term for the Company, including "yet to be announce[d] phones," the entering of a

5  "period of significant growth" and "overall gross margins at consistent levels," stating, in

6  pertinent part, as follows:

> In the mobile market, we're excited to report that there are multiple smart phones
> that include both our 6-axis MotionTracking solution as well as our two axis OIS
> products. These products include the LG G3 and Amazon Fire smart phones. As
> well as *a number of yet to be announced phones*, preparing to launch across
> multiple geographies in the coming months.

                                    *        *        *

> Turning our attention to the fiscal second quarter, we're ***excited to be entering a
> period of significant growth***. We are ***ramping into production at a number of
> new and existing customers*** in every region, which will bring us greater
> diversification and scale.

> While we expect volume ***shipments of our 6-axis MotionTracking SoCs to
> contribute the majority of this growth***, we also expect to achieve greater volume
> shipments across the majority of our motion products, including two axis OIS and
> 3-axis discrete gyroscopes.

                                    *        *        *

> Having strategically built inventory ahead of anticipated demand for our second
> generations 6-axis products in previous quarters, ***we are now able to meet
> significant new customer requirements*** even while we continue to add
> manufacturing capacity and ramp into production our third-generation 6-axis
> products.

> While we expect gross margins at some of our top-tier customers to remain under
> pressure, as a result of high-volume pricing, as well as lower initial manufacturing
> yields as we ramp new products into production, ***we believe our higher value
> system solutions combined with our aggressive manufacturing cost reductions,
> will keep our overall gross margins at consistent levels***.

                                    *        *        *

> We are especially please[d] to see our shipments and revenue grew in North
> America. Growing this quarter to be a substantial portion of our total business,
> driven primarily by significant share gain at several existing and new customers.

26         40.      Also during the call, Krock discussed the Company's strong financial outlook for

27  the second quarter of fiscal year 2015 and the fiscal year 2015, due in large part to new

28  customers in the United States and China, stating, in pertinent part, as follows:

*We see* continuing progress and strength and adoption of our products across customers and therefore *significant continuing market share gains in mobile markets*, due to our products higher performance and attractive features and size. We see this *progress at number of major customers including some representing new sizable market share gains at customers headquartered in both the United States and China*.  And we believe our products strength at all these customers, offers an important opportunity to continue our unit shipment and revenue growth in fiscal periods beyond the current year.

Considering these factors, *we expect FY15 Q2 revenue to be in the range of $86 million to $91 million*.  To support this Q2 fiscal 2015 revenue outlook, *we currently have backlog in place representing a majority of this total current quarter revenue target*.

41.    On the call, Krock represented that the second quarter was only the beginning for these new customers, that the third quarter looked bright as well, and that margins would remain at historical levels notwithstanding the Company's growth prospects and dependence on large customers.  Furthermore, even though Krock did not mention Apple by name, he described a new customer that the market correctly inferred was Apple.

42.    Indeed, Krock stated, in pertinent part, as follows:

*These Q2 FY15 outlook estimates reflect only a partial quarter estimate of the related revenue opportunities*.  As these new product opportunities with both United States-based and China-based OEMs are only expected to be in production for part of our fiscal Q2.  Therefore these new product opportunities can contribute significant additional amounts of revenue when in production for our entire fiscal Q3 period.

We expect sales at our largest customer, Samsung Electronics, to represent mid-20% to 30% of this target, reflecting strength in applications where we have existing designs and are participating in expected new customer design launches.

Additionally, we expect that LG will continue to be a 10%, September quarter customer as in the June quarter.  Potentially together with at least one China-based OEM depending upon the level of total Q2 revenue achieved.  *And that we will have at least one new 10% customer as of the September and future quarters*.

As mentioned, *some* of the opportunities in the United States and China *represent near-term significant market share gains and others represent new inertial sensor, especially gyroscope attach rate opportunities*.  We also expect new mobile market sensor applications such as microphones and OIS to contribute to future revenue growth, albeit with somewhat uncertain timing.

Product mix for the current quarter continues to favor our highest volume mobile customers.  And *we should generate a total gross margin in line with recent levels.  We believe that on a GAAP basis our Q2 FY15 gross margin will be in a range around 48% continuing to now modestly reflect the impact of additional cost of amortization of intangibles acquired*.

*On a **non-GAAP basis, Q2 FY15 gross margin is expected to be consistent with recent past quarters that is in the range around 50%**.  In future quarters, lower-cost of products, additional production volumes, and improving product yields should contribute to a favorable impact on our gross margin.  **Therefore our target non-GAAP gross margin remains unchanged**.*

*         *         *

We expect our spending in margin opportunities for our FY15 -- *we continue to expect gross margins generally consistent with our recent past and FY14 on a non-GAAP basis and on a GAAP basis in a range of around approximately 48%*.

*         *         *

And therefore earnings per share range around $0.80 per share on a non-GAAP basis and on a GAAP basis we expect earnings per share in the range around 35% -- $0.35 per share.  Of course both earnings estimate exclude any foreseen events or activities, which could arise in the future.

43.     In response to a question about the potential downside due to a decrease in orders from certain existing customers, Krock assured investors and analysts that a "larger new customer" (*i.e.*, Apple), would more than offset any declines, stating, in pertinent part, as follows:

As Behrooz says, there's a lot of different new products coming into production and some potential additional new content to offset any potential change in unit volumes that people are concerned with.

***So, with a larger newer customer that's going to be, clearly 10% or greater of revenue, the percent that any one of the other existing customers occupy will drop off some.  But generally levels of revenue and opportunities are similar going forward, especially considering additional potential content that may be in some of the newer products***.

44.     Finally, while on the call, Krock responded to a question by Mark Delaney, a Goldman Sachs analyst, about potential pricing pressures from existing customers by stating that "***there's no one customer with any particular window of pricing that's relevant.***"

45.     Analysts were optimistic about the Company's prospects after the conference call, assumed that Apple was the new U.S.-based customer, and believed that business from Apple for the iPhone 6 was incorporated into the Company's guidance, including statements about margins.

46.     For example, a research report from Ascendiant Capital Markets, LLC dated July 30, 2014, stated, in pertinent part, as follows:

As expected INVN delivered a strong June quarter and provided further evidence that supports our belief of the initial participation in Apple's (AAPL, N/R) portfolio, likely in both the iPhone6 and wearables.

\*      \*      \*

The only downside of adding a customer the size of Apple, and possibly Xiaomi, is that these unit sizes typically come with volume discounts that limit gross margin upside.  However, ***now that we believe Apple is being incorporated into the firm's guidance for September and the full-year, gross margins look to be stabilizing around the 50% mark, and we believe should set a new base for the company to improve on through growing yields and cost reductions***.

47.     On August 7, 2014, the Individual Defendants caused the Company to file its Form 10-Q with the SEC, which was signed and/or certified by Abdi and Krock, for the quarter ended June 29, 2014 (the "1Q15 Form 10-Q").  The 1Q15 Form 10-Q, among other things, reiterated the financial results reported by the Company on July 29, 2014.

48.     Between August 6, 2014 and September 15, 2014, the Insider Selling Defendants collectively sold 187,687 shares of InvenSense common stock for total proceeds exceeding $4.6 million at prices they knew or should have known were inflated, ranging from $23.07-$25.33 per share.

49.     On August 25, 2014, the Individual Defendants caused the Company to announce in a press release that, effective September 2, 2014, Krock would be resigning from his employment at InvenSense and that Mark P. Dentinger ("Dentinger") would succeed Krock as vice president and CFO.  The press release also stated that Krock would serve as a special advisor to the Company to help with the transition through October 31, 2014.

50.     On September 4, 2014, the Individual Defendants caused the Company to file a Form 8-K with the SEC attaching Krock's separation agreement, which contains a non-disclosure clause and provides that the Company is to pay him severance of $175,000 and a consulting fee of $25,000 for the months of September and October 2014.

51.     On September 9, 2014, Apple announced the iPhone 6 and 6 Plus, which contained an InvenSense MEMS sensor.

52.     On September 18, 2014, the Individual Defendants caused the Company to file a Form 8-K with the SEC which reported that the Company held its annual meeting of

1    stockholders and that Abdi and Stang were elected as directors, securing their positions on the

2    Board until 2017.

3                                   **REASONS STATEMENTS WERE IMPROPER**

4          53.    The true facts, which were known or were recklessly disregarded by the

5    Individual Defendants but concealed from the investing public, were as follows:

6                 (a)    the Company entered into an agreement with Apple to supply sensors for

7    the iPhone 6 and iPhone 6 Plus at heavily discounted prices compared to other customers;

8                 (b)    the low prices charged to Apple, along with the low prices charged to

9    Samsung, had, and would continue to, negatively impact the Company's margins;

10                (c)    InvenSense encountered manufacturing problems and inefficiencies

11   associated with the development and rollout of the iPhone 6 and iPhone 6 Plus which negatively

12   impacted margins;

13                (d)    the Individual Defendants lacked a reasonable basis to cause the Company

14   to provide its stated near term financial guidance or to assure investors that margins would be

15   consistent with historical levels;

16                (e)    the Company's Form 10-Q for the first quarter of 2015 failed to disclose

17   then presently known trends, events or uncertainties associated with the Company's sales and

18   margins that were reasonably likely to have a material effect on InvenSense's future operating

19   results; and

20                (f)    as a result of the foregoing, the Individual Defendants lacked a reasonable

21   basis for their positive statements about the Company's financial performance and outlook

22   during the Relevant Period.

23                                        **THE TRUTH EMERGES**

24         54.    On October 28, 2014, the Individual Defendants caused the Company to issue a

25   press release announcing its financial results for its second fiscal quarter ended September 28,

26   2014 including net revenue of $90.2 million and net loss of $6.868 million.  The Company also

27   reported, among other things, disappointing GAAP gross margins of only 35% and non-GAAP

28

gross margins of 37%, compared with GAAP gross margins of 47% and non-GAAP gross margins of 50%, in the first quarter of fiscal 2015.

55.     The October 28, 2014 press release stated, in pertinent part, as follows:

Gross margin determined in accordance with U.S. generally accepted accounting principles (GAAP) for the second quarter of fiscal 2015 was 35 percent, compared with 47 percent for the first quarter of fiscal 2015.  GAAP gross margin for second quarter fiscal 2015 included stock-based compensation and related payroll taxes, and amortization of acquisition intangibles.

Excluding these items, non-GAAP gross margin for the second quarter fiscal 2015 was 37 percent, compared with 50 percent for the first quarter of fiscal 2015.  The sequential decrease in gross margin was primarily attributable to two factors: a non-recurring inventory charge largely related to earlier generations of the company's products that reduced the gross margin by approximately eight percentage points, and a shift in revenue mix towards lower margin, high volume customers that reduced the gross margin by approximately five percentage points.

56.     Later that evening, the Individual Defendants caused the Company to hold a conference call for analysts and provided additional information about the Company's performance.  During the conference call, Dentinger, the Company's new CFO, discussed the Company's disappointing margins, stating, in pertinent part, as follows:

Most of our Q2 performance was within our expectations with the Company issued guidance early in Q2, except for gross margins.  The lower than expected gross margins had the effect of reducing our non-GAAP EPS by about $0.11.

*       *       *

There were three primary factors contributing to the lower gross margin performance this quarter.

***First, we recorded approximately $7.4 million in adjustments in Q2, mostly to write down earlier generation inventory that is now excess or obsolete***.  These inventory write-downs resulted in 8-point margin reduction from our Q1 actuals.  We do not expect most of these adjustments to repeat in Q3.

***Second, while unit volumes exceeded our expectations, a greater than anticipated contribution of this quarter's revenue came from our largest customers, and these customers generate lower average selling prices***.  We also sold some of our older product at prices that diluted our margins in Q2.  The combinations -- the combination of these pricing issues resulted in a 3 percentage point quarter over quarter decline in gross margin.

***We expect that the customer mix issue will continue for the rest of the fiscal year and we have factored this expectation into our Q3 guidance***.

***Finally, our yielded manufacturing costs, especially for our newer products, were higher than we expected and this lowered our gross margin by 2 percentage points in Q2***.  We also expect this phenomenon to continue into Q3.

1              *     *     *

2    Looking towards Q3, we are estimating that total revenue will be within a range
     of $108 million to $115 million, with a customer and market mix approximately
3    what we experienced in Q2.  As a result, our expectations for non-GAAP gross
     margins in fiscal Q3 is a range between 46% and 47%.

4
     Our Q3 non-GAAP gross margin guidance presumes that most of the inventory
5    adjustments we recorded in Q2 will not be repeated.  The margin guidance does
     presume some of the pricing pressure resulting from our mix of business towards
6    larger customers and most of our cost pressure will continue.

7    Non-GAAP operating expenses are expected to rise by about $2 million from Q2
     with R&D expenses forecasted at about $19 million and SG&A expenses at
8    $10 million.  The Q3 increase in operating expenses takes into consideration a full
     quarter of expenses for TPI and Movea.  Our non-GAAP net other expense and
9    our tax rate should be about flat with Q2.

10   Non-GAAP EPS should be a range between $0.17 and $0.21 per share, assuming
     an average share count of about 95 million.  If you are modeling us on a GAAP
11   basis, our gross margin should be between 43% and 44%.  Our operating margin
     should be between 8% and 12%, and our GAAP EPS should be between $0.06
12   and $0.10 in Q3.

13        57.    During the call, Abdi and Dentinger responded to a question from an analyst

14   about margins, stating, in pertinent part, as follows:

15   **Ruben Roy** - *Piper Jaffray* – Analyst

16   Can you maybe walk us through some more details on some of the moving parts
     around the gross margin?  You gave us guidance back in late July and I'm
17   wondering what some of the changes were during the quarter, around ASPs and
     yields, that you hadn't seen when we got the original guidance.

18
19   **Mark Dentinger** - *InvenSense, Inc.* – CFO

20   We were a little surprised by the strength of the contribution from our large
     customers, which, on general, bring lower gross margins.  And, as a result of that,
     we felt a little bit of that pressure.

21
22   Second, we did move some older material at reduced margins during the quarter
     that we don't expect to repeat going forward.  And we are still digesting some of
23   the cost pressure from ramping up the production with the new customers.  So the
     combination of those three factors really had us about 5 points lower than what
     we were calling as we entered the quarter.

24
25   And, as I indicated in my guidance, we do expect some of that pressure to
     continue as we move into Q3.  But we are forecasting that there will be an
26   improvement off of what would be the, quote-unquote, adjusted 45 points of gross
     margin as we move into Q3.  And we are looking at 46% to 47% margins for this
     quarter.

27
28

**Behrooz Abdi** - *InvenSense, Inc.* – President and CEO

This is Behrooz.  Let me add a little bit more color.  As we talked at the last earnings call, what we said was that, to the extent that our tier 1 customer mix changes and they become more dominant, that it will be more difficult to hit the gross margin early on, until we get to full production yielded and kind of a steady-state run rate.

And, if you look at our business mix, the top two customers are more dominant this past quarter and the current quarter than we anticipated when we started.  The rest of the market -- the rest of the customers and product lines are either at or well above the corporate goal in terms of gross margin.  So it is really the mix, as Mark mentioned, is more than anticipated towards the tier ones.

58.    Abdi's exchange with the same analyst continued during the call, with the analyst asking a question about pricing dynamics with customers, stating, in pertinent part, as follows:

**Ruben Roy** - *Piper Jaffray* – Analyst

Thanks for that.  I wondering, on sort of the pricing negotiations, I mean, are there pricing dynamics over the course of three or six months?  Or are they -- how does that work?  I'm trying to figure out if there are additional ASP-related margin impacts that we might expect over the next couple of quarters.

And then, I guess, as a follow-up, the near-term improvement that Mark discussed for the December quarter, is that all yield based?

**Behrooz Abdi** - *InvenSense, Inc.* – President and CEO

Yes.  Some of them are yield based; some of them are just, again, based on the pricing given to some of the customers to get the revenue and the market and to really get that going.  But, in terms of the pricing, it really depends on the customer.

There are customers that, even tier ones, that when we set the price roadmap, pretty much done for the year, for the next year.  So, what we anticipate in terms of going forward, it is already baked in.  And then there are customers, as you know, that negotiate on a quarterly basis and that is what we have been used to in the past.  And, again, we make some assumption around those in our prediction of pricing and gross margins.

59.    On the call, Dentinger responded to another question about margins from a different analyst, stating, in pertinent part, as follows:

**Joe Moore** - *Morgan Stanley* – Analyst

I wanted to follow up on the customer concentration issue that you said customers -- if I heard this right -- greater than 10% of revenues had only moved up from 52% last quarter to 55% this quarter.  I was a little bit surprised by that, given that you had brought up a new customer, and also that you guys were surprised it by the shift when it doesn't seem like it was that big.  Was it just the two OEMs that were the problem or was there some other issue?

1     **Mark Dentinger** - *InvenSense, Inc.* – CFO

2     Let me answer them in reverse order, Joe.  It was just the two OEMs -- the large OEMs that created most of the pricing pressure.  The other phenomenon -- it is a
3     little bit more subtle.

4     It is true that our contribution from 10% customers moved from 52% to 55% during the quarter, but there were more than two customers contributing to the
5     52% in Q2 -- or excuse me, in Q1.  So we only had two customers contributing in Q2, so there was a pretty substantial move inside the 10% customers upstream to
6     the lower margin arena.

7     60.    In response to the negative news, the price of InvenSense shares fell from

8  $21.48 per share on October 28, 2014 to close at $16.08 per share on October 29, 2014, a drop of

9  more than 25%, on extremely heavy trading volume.  Stated differently, the Company lost more

10  than $450 million in market capitalization in a single day.

11     61.    Indeed, investors were not the only ones unimpressed by InvenSense's poor

12  financial results and pressured margins – analysts covering InvenSense were dissatisfied as well.

13     62.    For example, an October 29, 2014 research report characterized the Company as

14  having a "[d]isappointing quarter," and stated that "[i]t's going to take time for confidence to be

15  restored."  The report further stated, in pertinent part, as follows:

16     **Our take**: Disappointing quarter.  We had forecast higher revenues and lower
17     GMs vs. company guidance, and they fell short of our estimate on both counts as average selling prices, principally to Apple which we estimate was 31% of sales
18     in the qtr, were lower . . .

19     **What happened**: Non gaap eps of $0.06 on $90mn revs (vs. MSe $0.20 / $96mn and consensus $0.16 / $90mn).  Gross margins were 34.7% vs. 50% guidance and
20     our estimate of 48%; excluding an 8 point impact from inventory writedown, GMs would have been 42.7%, still quite disappointing.  We believe Apple ASPs
21     were even lower than we had forecast, and INVN initial manufacturing yields weren't great.  Apple and Samsung combined were 55% of revenues.  Opex was
22     slightly higher after taking into consideration one off expenses for TPI and Movea.  We model GAAP operating margins at 11.5% in 3q15.  December qtr
23     guidance was for revs $108-115 (we were $121, consensus $116), gross margins 46-47% (we were 48%), and higher opex and share count than we had modelled.

24     **Why gross margins were worse**.  The company cited higher volumes from the top 2 customers, Apple and Samsung, who are 55% of revenues, but we believe
25     those customers were in line with our model; overall revenues were only slightly higher than forecast.  Our sense is that the company's plan to achieve margin
26     improvement while ramping Apple required near perfect yields, but that proved too optimistic as meeting quality requirements with a new product required
27     bringing yields down.   We were not confident in prospects for margin improvement while ramping Apple, but are still surprised by the magnitude of the
28     shortfall; it's somewhat healthy that GM targets are more achievable.  Having

said that, we are discouraged that opex and share count continue to rise faster than the company's forecast, with R&D up 166% in 5 qtrs (partly due to M&A).

63.   An October 29, 2014 article in *Barron's* entitled "InvenSense Plunges 24%: Crushed by Lower Prices in Apple, Samsung Wares," discussed the Company's stock drop after its earnings release, stating, in pertinent part as follows:

> Shares of sensor maker InvenSense (INVN) are down $5.22, or 24%, at $16.26, after the company yesterday afternoon reported fiscal Q2 revenue and earnings per share that missed analysts' expectations, and forecast results this quarter lower as well.
>
> Revenue in the three months ended in September rose 27% to $90.2 million, missing consensus of $90.7 million, and EPS of 5 cents was well below consensus for 16 cents.
>
> The company forecast revenue of $108 million to $115 million this quarter, and EPS of 17 cents to 21 cents, missing the Street's average estimate for $117 million and 31 cents.
>
> **Gross margin** declined from 50% a year earlier to 37%, on a non-GAAP basis.
>
> **CEO Behrooz Abdi** said it was an "exciting time" for the company, noting record revenue, and cited a "full portfolio of differentiated products that we believe will provide meaningful growth opportunity for years to come."
>
> **CFO Mark Dentinger** on the conference call said InvenSense was selling into products with lower average selling prices, crimping InvenSense's own prices and margins.
>
> > *While unit volumes exceeded our expectations, a greater than anticipated contribution of this quarter's revenue came from our largest customers, and these customers generate lower average selling prices.  We also sold some of our older product at prices that diluted our margins in Q2.  The combinations – the combination of these pricing issues   resulted in a 3 percentage point quarter over quarter decline in gross margin.  We expect that the customer mix issue will continue for the rest of the fiscal year and we have factored this expectation into our Q3 guidance.*
>
> The stock has gotten three downgrades this morning, that I can see, from Piper Jaffray, Pacific Crest, and Northland.
>
> Pac Crest's John Vinh, cutting his rating, to Sector Perform from Outperform, writes that "more things went wrong than right."
>
> InvenSense didn't "execute" well, he thinks, but also its dominant market share in products from Apple (AAPL), and Samsung Electronics (005930KS) actually hurt, not helped.
>
> He thinks the company probably saw pressure on pricing from some Apple products:

1
2
3
4
5
6
7
8

*Despite having secured a dominant position at Apple and Samsung, indeed, 100% share, InvenSense executed poorly in what was anticipated to be one of the strongest quarters in the company's history.  Instead, price pressures from Apple and Samsung and the acknowledgment of potential second-sourcing significantly reduce our confidence that InvenSense will be able to sustain growth and avoid multiple compression [ . . . ] Pricing pressure associated with Apple business is having a substantial impact on InvenSense's margin expectations.  The company indicated that it expects pricing pressures will continue for the next several quarters, which lowers its gross margin outlook to the high 40%s from 50%-55%.  As FQ3 (Dec.) is expected to have similar product and customer mix, InvenSense guided gross margin for the quarter to be 46%-47%.  The company remains confident that its new product launches in F2016 will help improve the margin profile.  However, we anticipate that lower gross margin will contract valuation multiples.*

9   [Emphasis in original.]

10   **INSIDER SELLING**

11   64.   Not all shareholders were harmed by the Individual Defendants' actions.

12   65.   Indeed, during the Relevant Period, former CFO Krock and Director Defendants
13   Shah and Wilson – along with several other InvenSense insiders including the Company's
14   General Counsel – took advantage of the artificially inflated stock price by collectively
15   unloading 217,628 shares of common stock for total proceeds of $5,314,996 at prices ranging
16   from $22.25 per share to $25.33 per share – well above the closing price of $16.08 per share
17   InvenSense sank to on October 29, 2014 following the disclosure of the Company's
18   disappointing financial results for the second fiscal quarter ended September 28, 2014 and
19   compressed margins.

20   66.   Specifically, as is detailed further in the chart below, the Insider Selling
21   Defendants collectively disposed of 187,687 shares of InvenSense common stock for total
22   proceeds exceeding $4.6 million:

| InvenSense, Inc (INVN) | | | | | |
| --- | --- | --- | --- | --- | --- |
| Relevant Period Insider Defendants' Sales | | | | | |
| | | | | | |
| **Filer Name** | **Position** | **Date** | **Shares** | **Price** | **Proceeds** |
| **Krock, Alan F** | Chief Financial Officer | 18-Aug-2014 | 1,666 | $24.70 | $41,150 |
| | | 27-Aug-2014 | 69,650 | $25.03 | $1,743,340 |
| | | 27-Aug-2014 | 25,000 | $24.88 | $622,000 |
| | | 27-Aug-2014 | 5,350 | $25.03 | $133,911 |
| | | 28-Aug-2014 | 25,000 | $25.33 | $633,250 |
| | | | 126,666 | | $3,173,650 |

| | | | | | |
|---|---|---|---|---|---|
| **Shah, Amit** | Director | 06-Aug-2014 | 2,171 | $23.95 | $51,995 |
| | | 06-Aug-2014 | 28 | $23.95 | $671 |
| | | 06-Aug-2014 | 14 | $23.95 | $335 |
| | | 11-Aug-2014 | 256 | $24.60 | $6,298 |
| | | 11-Aug-2014 | 19,616 | $24.60 | $482,554 |
| | | 11-Aug-2014 | 128 | $24.60 | $3,149 |
| | | | 22,213 | | $545,001 |
| | | | | | |
| **Wilson, Timothy M** | Director | 15-Sep-2014 | 38,808 | $23.07 | $895,301 |
| | | | | | |
| **TOTALS** | | | **187,687** | | **$4,613,952** |

67.     These sales were made under highly suspicious circumstances and while the Insider Selling Defendants possessed material, non-public Company information.  Indeed, at the time of the sales, the Insider Selling Defendants either knew or should have known that:

(a)     the Company entered into an agreement with Apple to supply sensors for the iPhone 6 and iPhone 6 Plus at heavily discounted prices compared to other customers;

(b)     the low prices charged to Apple, along with the low prices charged to Samsung, had, and would continue to, negatively impact the Company's margins;

(c)     InvenSense encountered manufacturing problems and inefficiencies associated with the development and rollout of the iPhone 6 and iPhone 6 Plus which negatively impacted margins;

(d)     the Individual Defendants lacked a reasonable basis to cause the Company to provide its stated near term financial guidance or to assure investors that margins would be consistent with historical levels;

(e)     the Company's Form 10-Q for the first quarter of 2015 failed to disclose then presently known trends, events or uncertainties associated with the Company's sales and margins that were reasonably likely to have a material effect on InvenSense's future operating results; and

(f)     as a result of the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company's financial performance and outlook during the Relevant Period.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

68.     Indeed, because of their roles as directors and/or officers of InvenSense during the Relevant Period, the Insider Selling Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known the adverse, non-public information about the business of InvenSense, including the adverse information regarding the Company's financial performance and margin compression that existed during the Relevant Period.

69.     Thus, the Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse non-public information concerning InvenSense's business and prospects.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### *Fiduciary Duties*

70.     By reason of their positions as officers, directors, and/or fiduciaries of InvenSense and because of their ability to control the business and corporate affairs of InvenSense, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage InvenSense in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of InvenSense and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

71.     Each director and officer of the Company owes to InvenSense and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

72.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's production costs, operating income, operating cash flows, business, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

1

*Audit Committee Duties*

2   73.   In addition to these duties, the members of the Audit Committee owed specific

3   duties to InvenSense under the Audit Committee's Charter to review and approve quarterly and

4   annual financial statements and earnings press releases, and to ensure that the Company had

5   appropriate and effective internal controls over financial reporting.

6   74.   Specifically, InvenSense's Audit Committee Charter states, in relevant part that

7   "the duties of the [Audit] Committee shall include, without limitation, the following:" is

8   responsible for, among other things:

9   *Documents/Reports/Accounting Information Review*

10                     *      *      *

11   2. Review and discuss with management and the independent registered
     accounting firm the Corporation's annual financial statements, including the
     Management's Discussion and Analysis proposed to be included in the
12   Corporation's Annual Report on Form 10-K, quarterly financial statements,
     and all internal controls reports (or summaries thereof), if any, and
13   recommend to the Board, if appropriate, that the audited financial statements
     be included in the Corporation's Annual Report on Form 10-K for filing with
14   the SEC. To the extent practical and appropriate, review other relevant reports
     or financial information submitted by the Corporation to the SEC, or the
15   public, including management certifications as required by the Sarbanes-
     Oxley Act of 2002 (Sections 302 and 906), and any relevant reports rendered
16   by the independent registered public accounting firm (or summaries thereof).
     Review and discuss with management and the independent registered public
17   accounting firm, in connection with management certifications pursuant to
     Section 302 of the Sarbanes-Oxley Act of 2002, all significant deficiencies
18   and material weaknesses in the design or operation of internal control over
     financial reporting which are reasonably likely to adversely affect the
19   Corporation's ability to record, process, summarize and report financial
     information and any fraud, whether or not material, that involves management
20   or other employees who have a significant role in the Corporation's internal
     control over financial reporting.

21
     3. Prepare the Audit Committee report required to be included in the
22   Corporation's proxy statement.

23   4. Discuss and review policies adopted by the Corporation concerning
     whether to provide forward looking guidance and the frequency and manner
24   of providing such guidance. Have one or more members of the Committee, in
     particular if reasonably available the Chair of the Committee, review, before
25   release, the unaudited operating results in the Corporation's quarterly earnings
     release and/or discuss the contents of the Corporation's quarterly earnings
26   release with management. Review with financial management and the
     independent registered public accounting firm each Quarterly Report on Form
27   10-Q prior to its filing.

28   5. Discuss the Corporation's earnings press releases.

6. Have one or more members of the Committee, in particular if reasonably available the Chair of the Committee, review, before release, any non-GAAP or "pro forma" financial information, guidance or revised guidance to be included in a press release of the Corporation.

7. To the extent practical and appropriate, review the regular internal reports (or summaries thereof) to management prepared by the internal auditing department, if any, and management's response.

8. Discuss policies with respect to risk assessment and risk management, including risks of fraud related to the business of the Corporation.

\*     \*     \*

*Financial Reporting Processes and Accounting Policies*

13. In consultation with the independent registered public accounting firm and the internal auditors, if any, review the integrity of the organization's financial reporting processes (both internal and external), and the internal control structure (including disclosure controls).

14. Review with management the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Corporation.

\*     \*     \*

18. Review basis for estimates and judgment made by management.

19. Review the accounting treatment of any significant non-routine transactions.

75.     Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

### Duties Pursuant to the Company's Code of Business Conduct and Ethics

76.     Additionally, the Individual Defendants, as officers and/or directors of InvenSense, are bound by the Company's Code of Business Conduct and Ethics (the "Code"). Indeed, the Code states that:

InvenSense, Inc. and its subsidiaries (collectively, the "Company" or "InvenSense") is committed to conducting its business in accordance with applicable laws, rules and regulations, and in a manner consistent with the highest standards of business ethics. The Company expects the highest possible ethical conduct from its employees, officers and directors. You are expected to participate in and foster a culture of transparency, integrity and honesty in the Company. Each director, officer and employee is required to review this Code and be aware of the laws that are applicable to the Company's business.

77.     Specifically, with respect to insider trading, the Code states:

**<u>Securities Trading</u>**. It is usually illegal to buy or sell securities using material information not available to the public. Persons who give such undisclosed "inside" information to others may be as liable as persons who trade securities while possessing such information. Securities laws may be violated if you, or any relatives or friends trade in securities of the Company, or any of its customers or vendors, while possessing inside information. You must comply with the Company's insider trading policy, which is posted on our Intranet at "Company Info, Insider Trading Policy." If you are uncertain about the legality of a particular trade, the legal department and the Company's insider trading monitor can assist you with any inquiries.

78.     Specifically, with respect to SEC filings and financial disclosures, the Code states:

**<u>Books and Records, Accurate Periodic Reports and Financial Statements.</u>**

\*       \*       \*

Full, fair, accurate, timely and understandable disclosures in the Company's periodic reports to the public and to governmental authorities are legally required and are essential to the success of our business. All filings with the SEC must be fair, accurate and timely. You should exercise the highest standard of care in contributing to or preparing such reports in accordance with the following guidelines:

• All the Company accounting records, as well as reports produced from those records, must be in accordance with the laws of each applicable jurisdiction.

• All records must fairly and accurately reflect the transactions or occurrences to which they relate.

• All records must fairly and accurately reflect, in reasonable detail, the Company's assets, liabilities, revenues and expenses.

• The Company's accounting records must not contain any false or intentionally misleading entries.

• No transactions should be intentionally misclassified as to accounts, departments or accounting periods.

• All transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period.

• No information should be concealed from the internal auditors or the independent auditors, who shall have unrestricted access to all documents and records.

• Compliance with the Company's system of internal accounting controls is required.

1                                   *        *        *

2        79.    The Code further states:

3            **Compliance With Laws**. You are expected to comply with both the letter and
             spirit of all applicable governmental laws, rules and regulations. If you fail to
4            comply with this Code and/or with any applicable laws, you will be subject to
             disciplinary measures, up to and including immediate discharge from the
5            Company.

6        80.    According to the Code, Adam Tachner ("Tachner"), Vice President and General

7    Counsel, is designated as the "Ethics Officer to be available to assist you with questions

8    regarding [the] Code or to report violations of the Code or misconduct."  During the Relevant

9    Period, Tachner sold 13,930 shares of InvenSense common stock for proceeds of $309,943 at an

10   inflated price of $22.25 per share.

11       81.    According   to   the   Company's   investor   relations   page   located   at

12   http://ir.invensense.com/phoenix.zhtml?c=237953&p=irol-govhighlights,  the   Code   was   last

13   amended and restated on April 25, 2014.  Thus, the Company maintained a version of the Code

14   at all times during the Relevant Period that imposed the same, or substantially and materially the

15   same or similar, duties on, among others, the Board, as those set forth above.

16   ***Insider Trading Policy and Guidelines for Disclosure of Material Non-Public Information***

17       82.    Upon information and belief, the Company maintained an Insider Trading Policy

18   and Guidelines for Disclosure of Material Non-Public Information ("Insider Trading Policy")

19   during the Relevant Period.

20       83.    The purpose of the Insider Trading Policy is to provide "guidelines to all

21   personnel, including employees, directors and officers of InvenSense, Inc. (the "Company"),

22   with respect to transactions involving the Company's securities and the handling of confidential

23   information about the Company and the companies with which it does business."

24       84.    The Insider Trading Policy states, in part:

25   **GUIDELINES**

26           1.      **Prohibition**. Every employee, officer and director of the Company
             is prohibited from: (a) buying or selling the Company's securities while in
27           possession of material non-public information; (b) communicating such
             information to others except those who "need to know" based on their doing
28           business with or for the Company; (c) recommending the purchase or sale of
             the Company's securities while in the possession of material information that

has not been publicly disclosed by the Company; or (d) assisting anyone engaged in any of the above activities. This prohibition also applies to information about, and the securities of, other companies with which the Company has a relationship through which an employee, officer or director may acquire the material non-public information of that company.

There are no exceptions to this Insider Trading Policy other than those described in paragraph 12 below. Engaging in transactions in the Company's securities that are otherwise necessary for personal reasons, such as personal financial commitments, are still prohibited if you possess material non-public information. Even the appearance of an improper transaction must be avoided to prevent any potential prosecution of the Company or the individual trader. If you know or suspect that a director, officer or employee of the Company has violated this Insider Trading Policy, we encourage you to contact the Corporate Compliance Officer. You are free to do so on an anonymous basis.

85. With respect to material non-public information, the Insider Trading Policy states that:

**5.    Material Non-Public Information**. "Material" information is **_any information which could affect the market for the Company's securities or that a reasonable investor would consider important in making a decision to purchase, hold or sell the Company's securities_** (e.g., information regarding a possible merger or acquisition involving the Company or major marketing changes). Chances are, if you learn something that leads you to want to buy or sell stock, that information will be considered material. It is important to keep in mind that material information can be any kind of information: information that something is likely to happen, or even just that it may happen, can be considered material. **_In short, any information which could reasonably affect the price of or influence a person's decision to buy or sell the Company's stock is "material."_**

"Non-public" information is any information that has not been disclosed generally to the investing public. For example, a speech to an audience, a TV or radio appearance or an article in a trade magazine does not qualify as full disclosure. Therefore, "non-public" information made available in any such manner will continue to be considered "non-public" until more broadly disseminated. Disclosure by press release or in the Company's periodic reports filed with the SEC is necessary to make the information public. Even after the Company has released information to the press and the information has been reported, at least one full business day (that is, a day on which national stock exchanges and the New York Stock Exchange is open for trading) should generally be allowed for the investing public to absorb and evaluate the information before you trade in the Company's securities.

Although it is not possible to list all types of material information, the following are a few examples of information that is particularly sensitive and should be treated as material:

• **_changes in estimates of earnings or sales_**

• **_quarterly or annual financial results or projections_**

1      • stock splits or securities offerings

2      • design wins or changes in customer forecasts, up or down

3      • possible mergers and acquisitions

4      • significant acquisitions or dispositions of assets

5      • significant contracts and technology licenses

6      • contract negotiations with a potentially significant new customer

7      • changes in management

8      • the introduction of important products

9      • serious product defects or recalls

10      • major marketing changes

11      • significant litigation

12      • unusual gains or losses in major operations

13      • financial liquidity problems

14      • establishment of a repurchase program for the Company's securities

15      • changes in auditors

16

17      If you have any question as to whether particular information is material or non-public, you should not trade or communicate the information to anyone without prior approval by the Corporate Compliance Officer.

18      86.    According to the Company's Insider Trading Policy, the CFO is the Corporate

19 Compliance Officer and is responsible for the administration of the Insider Trading Policy.

20 Krock was CFO from the start of the Relevant Period until September 2, 2014.  Prior to his

21 departure from the Company, Krock sold 126,666 shares of InvenSense common stock for

22 proceeds of more than $3.0 million at inflated prices ranging from $24.70-$25.33 per share.

23      ***Control, Access, And Authority***

24      87.    The Individual Defendants, because of their positions of control and authority as

25 directors and/or officers of InvenSense, were able to and did, directly and/or indirectly, exercise

26 control over the wrongful acts complained of herein, as well as the contents of the various public

27 statements issued by InvenSense.

28

88.     Because of their advisory, executive, managerial, and directorial positions with InvenSense, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of InvenSense.

89.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of InvenSense, and was at all times acting within the course and scope of such agency.

### *Reasonable And Prudent Supervision*

90.     To discharge their duties, the officers and directors of InvenSense were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of InvenSense were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls;

(d)     remain informed as to how InvenSense conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(e)     refrain from trading on material, non-public information; and

(f)     ensure that InvenSense was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**BREACHES OF DUTIES**

91.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to InvenSense and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of InvenSense, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of InvenSense, the absence of good faith on their part, and a reckless disregard for their duties to InvenSense and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to InvenSense.

92.     The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that the Company's positive statements about its financial performance and outlook during the Relevant Period were accurate when made.

93.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, InvenSense has expended, and will continue to expend, significant sums of money to rectify Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

94.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

95.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's positive statements about its financial performance and outlook during the Relevant Period were accurate when made.  In furtherance of this plan, conspiracy,

1   and course of conduct, the Individual Defendants collectively and individually took the actions

2   set forth herein.

3          96.    The purpose and effect of the Individual Defendants' conspiracy, common

4   enterprise, and/or common course of conduct was, among other things, to: (a) disguise the

5   Individual Defendants' violations of law, including breaches of fiduciary duties and unjust

6   enrichment; and (b) disguise and misrepresent the Company's lack of and/or deficient internal

7   controls, financial performance, and business prospects.

8          97.    The Individual Defendants accomplished their conspiracy, common enterprise,

9   and/or common course of conduct by causing the Company to purposefully, recklessly, or

10   negligently release improper statements.  Because the actions described herein occurred under

11   the authority of the Board, each of the Individual Defendants was a direct, necessary, and

12   substantial participant in the conspiracy, common enterprise, and/or common course of conduct

13   complained of herein.

14          98.    Each of the Individual Defendants aided and abetted and rendered substantial

15   assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

16   commissions of the wrongdoing complained of herein, each Individual Defendant acted with

17   knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

18   wrongdoing, and was aware of his or her overall contribution to and furtherance of the

19   wrongdoing.

20                 **DAMAGES TO INVENSENSE**

21          99.    As a result of the Individual Defendants' wrongful conduct, InvenSense

22   disseminated false and misleading statements and omitted material information to make such

23   statements not false and misleading when made.  The improper statements have devastated

24   InvenSense's credibility.  InvenSense has been, and will continue to be, severely damaged and

25   injured by the Individual Defendants' misconduct.

26         100.    As a direct and proximate result of the Individual Defendants' actions as alleged

27   above, InvenSense's market capitalization has been substantially damaged, losing hundreds of

28   millions of dollars in value as a result of the conduct described herein.

101.    Further, as a direct and proximate result of the Individual Defendants' conduct, InvenSense has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending InvenSense and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on InvenSense's artificially-inflated stock price; and

(c)    costs incurred from the loss of the Company's customers' confidence in InvenSense's products.

102.    Moreover, these actions have irreparably damaged InvenSense's corporate image and goodwill.  For at least the foreseeable future, InvenSense will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that InvenSense's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

103.    Plaintiff brings this action derivatively in the right and for the benefit of InvenSense to redress injuries suffered, and to be suffered, by InvenSense as a direct result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants, and further as a direct result of the Insider Selling Defendants' insider selling and misappropriation of information.

104.    Plaintiff will adequately and fairly represent the interests of InvenSense in enforcing and prosecuting its rights.

105.    Plaintiff was a shareholder of InvenSense common stock during the Relevant Period, has been so continuously since, and is currently an InvenSense shareholder.

1      106.   Plaintiff did not make a pre-suit demand on the Board to pursue this action,

2  because such a demand would have been a futile and wasteful act as to a majority of the Board,

3  including the Director Defendants named herein.

4      107.   A true and correct copy of this complaint was delivered to InvenSense before its

5  filing with the Court.

6      108.   At the time this action was commenced, the Board consisted of the following

7  eight directors: the Director Defendants – Abdi, Olson, Shah, Stang, Wilson, and Yu – as well as

8  two other directors – Amir Faintuch and Emiko Higashi – both of whom became directors on or

9  about October 27, 2014, one day before the end of the Relevant Period, who have not been

10  named herein as defendants.

11    ***Demand Is Excused as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability***

12

13      109.   Director Defendants Abdi, Olson, Shah, Stang, Wilson, and Yu face a substantial

14  likelihood of liability for their individual misconduct.  The Director Defendants were directors

15  throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's

16  SEC filings, press releases, and other public statements and presentations on behalf of the

17  Company were materially accurate and did not misrepresent the Company's financials.

18  Moreover, the Director Defendants, as directors (and, in some cases, as Audit Committee

19  members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry,

20  oversight, and supervision to ensure that the Company's internal controls and/or internal auditing

21  and accounting controls were sufficiently robust and effective (and/or were being implemented

22  effectively), and to ensure that the Audit and Governance Committees' duties were being

23  discharged in good faith and with the required diligence and due care and that they were

24  complying with the Company's Code.  Instead, they knowingly and/or with reckless disregard

25  reviewed and authorized the publication of materially false and misleading statements

26  throughout the Relevant Period that caused the Company's stock to trade at artificially inflated

27  prices.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

110.    Further, the Director Defendants wasted corporate assets by paying improper compensation, bonuses, and/or severance to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

111.    The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of InvenSense to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile.

### Demand Is Futile As to the Audit Committee Defendants

112.    Defendants Olson, Stang, and Wilson, as Audit Committee members during the Relevant Period, were responsible for reviewing and approving quarterly and annual financial statements and earnings press releases, for overseeing the Company's internal controls over financial reporting, and for discharging their other duties described herein.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases, SEC filings, and earnings guidance.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

*Demand Is Futile as to Director Defendant Abdi for Additional Reasons*

113.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Abdi because Abdi is not an independent director.

114.    Demand is futile for the additional reason that, as CEO, Abdi is an employee of the Company who derives substantially all of his income from his employment with InvenSense, making him not independent.  As such, Abdi cannot independently consider any demand to sue himself for breaching his fiduciary duties to InvenSense, because that would expose him to liability and threaten his livelihood.

115.    Further, during the Relevant Period, while in possession of material, adverse, non-public Company information regarding the Company's financial performance and margin compression, Abdi made or caused others to make, false and misleading statements concerning the Company's financial performance and margins and about the purported adequacy of the Company's internal controls and compliance measures.  During this same Relevant Period, on or about September 12, 2014, Abdi secured his re-election as a Class III director for an additional three-year term.  Accordingly, for these additional reasons, Abdi faces a substantial likelihood of liability for breach of his fiduciary duties of loyalty and good faith.  Any demand upon Abdi therefore is futile.

*Demand Is Futile as to Director Defendant Stang for Additional Reasons*

116.    Demand is futile for the additional reason that, as a member of the Board, Stang derives a substantial amount of income, making him not independent.  Indeed, as reported in the Company's most recent Proxy filed with the SEC on or about July 25, 2014, for the fiscal year ended March 30, 2014 – and despite only having been a member of the Board since September 2013 – Stang received $624,731 in total compensation from InvenSense for serving on the Board.  As such, Stang cannot independently consider any demand to sue himself for breaching his fiduciary duties to InvenSense, because that would expose him to liability and threaten his livelihood.

117.    Further, during the Relevant Period, while in possession of material, adverse, non-public Company information regarding the Company's financial performance and margin

compression, Stang made or caused others to make, false and misleading statements concerning the Company's financial performance and margins and about the purported adequacy of the Company's internal controls and compliance measures. During this same Relevant Period, on or about September 12, 2014, Stang secured his re-election as a Class III director for an additional three-year term. Accordingly, for these additional reasons, Stang faces a substantial likelihood of liability for breach of his fiduciary duties of loyalty and good faith. Any demand upon Stang therefore is futile.

### *Demand is Futile as to Director Defendants Shah and Wilson for Additional Reasons*

118. In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Shah and Wilson because each defendant faces a substantial likelihood of liability for insider trading. Specifically, during the Relevant Period, while in possession of material, adverse, non-public Company information regarding the Company's financial performance and margin compression, Shah sold 22,213 shares at prices ranging from $23.95 to $24.60 per share, for total proceeds of $545,001. Similarly, during the Relevant Period, while in possession of material, adverse, non-public Company information regarding the Company's financial performance and margin compression, Wilson sold 38,808 shares at a price of $23.07 per share, for total proceeds of $895,301. During this same period, Shah and Wilson made, or caused others to make, false and misleading statements concerning the Company's financial performance and margins and about the purported adequacy of the Company's internal controls and compliance measures, which caused the Company's stock to remain at grossly artificially inflated prices. Accordingly, for these additional reasons, Shah and Wilson each face a substantial likelihood of liability for breach of his fiduciary duties of loyalty and good faith. Any demand upon Shah and Wilson therefore is futile.

119. In addition, Shah and Wilson co-founded Kaybus, Inc. ("Kaybus") and both are currently members of the Kaybus board of directors. Further, both Shah and Wilson are currently managing directors of Artiman Management, LLC ("Artiman"). This longstanding and extensive professional relationship between Shah and Wilson at Kaybus and Artiman renders Shah and Wilson incapable of independently considering a demand to sue one another.

*Demand Is Futile as to All Director Defendants for Additional Reasons*

120.    If InvenSense's current officers and directors are protected against personal liability for their acts of mismanagement and breaches of fiduciary duties alleged in this Verified Shareholder Derivative Complaint by directors and officers liability insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by InvenSense against the Individual Defendants, known as the "insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of InvenSense, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

121.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting InvenSense by prosecuting this action.  Therefore, demand on InvenSense and its Board is futile and is excused.

122.    InvenSense has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

123.    Plaintiff has not made any demand on shareholders of InvenSense to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    InvenSense is a publicly traded company with thousands of shareholders of record;

(b)      Making a demand on such a large number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of InvenSense shareholders; and

(c)      Making a demand on all shareholders would force Plaintiff to incur excessive expense and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

124.    The Company has been directly and substantially injured by reason of the Individual Defendants' breaches of their fiduciary duties to InvenSense.   Plaintiff, as a shareholder of InvenSense, seeks damages and other relief on behalf of the Company, in an amount to be proven at trial.

**COUNT I**

**Against The Individual Defendants For Breach Of Fiduciary Duties**

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    The Individual Defendants owed and owe InvenSense fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe InvenSense the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

127.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

128.    The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

129.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, InvenSense has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

130.    Plaintiff, on behalf of InvenSense, has no adequate remedy at law.

**COUNT II**

**Against The Individual Defendants For Unjust Enrichment**

131.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of InvenSense.

133.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to InvenSense.

134.   Further, the Insider Selling Defendants sold InvenSense common stock while in possession of material, adverse non-public information that artificially inflated the price of InvenSense stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

135.   Plaintiff, as a shareholder and representative of InvenSense, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

136.   Plaintiff, on behalf of InvenSense, has no adequate remedy at law.

**COUNT III**

**Against The Individual Defendants For Waste Of Corporate Assets**

137.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.   The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

139.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and

directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

140. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

141. Plaintiff, on behalf of InvenSense, has no adequate remedy at law.

## COUNT IV

**Against the Insider Selling Defendants for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information**

142. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143. At the time the Insider Selling Defendants unloaded InvenSense shares, they knew the information described above, and sold InvenSense stock on the basis of such information.

144. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold InvenSense stock.

145. At the time of their stock sales, the Insider Selling Defendants knew or should have known that:

(a) the Company entered into an agreement with Apple to supply sensors for the iPhone 6 and iPhone 6 Plus at heavily discounted prices compared to other customers;

(b) the low prices charged to Apple, along with the low prices charged to Samsung, had, and would continue to, negatively impact the Company's margins;

(c) InvenSense encountered manufacturing problems and inefficiencies associated with the development and rollout of the iPhone 6 and iPhone 6 Plus which negatively impacted margins;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    (d)  the Individual Defendants lacked a reasonable basis to cause the Company

2 to provide its stated near term financial guidance or to assure investors that margins would be

3 consistent with historical levels;

4    (e)  the Company's Form 10-Q for the first quarter of 2015 failed to disclose

5 then presently known trends, events or uncertainties associated with the Company's sales and

6 margins that were reasonably likely to have a material effect on InvenSense's future operating

7 results; and

8    (f)  as a result of the foregoing, the Individual Defendants lacked a reasonable

9 basis for their positive statements about the Company's financial performance and outlook

10 during the Relevant Period.

11   146.  The Insider Selling Defendants' stock sales while in possession and control of this

12 material adverse, non-public information constituted a breach of their fiduciary duty of loyalty

13 and good faith and/or an unlawful misappropriation of Company information.

14   147.  Since the use of the Company's proprietary information for their own gain

15 constitutes a breach of fiduciary duties and/or unlawful misappropriation of Company

16 information, the Company is entitled to the imposition of a constructive trust on any profits they

17 obtained thereby.

18   148.  Plaintiff, on behalf of InvenSense, has no adequate remedy at law.

19 **COUNT V**

20 **Against All the Individual Defendants for Aiding and Abetting Fiduciary Violations**

21   149.  Plaintiff incorporates by reference and realleges each and every allegation

22 contained above, as though fully set forth herein.

23   150.  The wrongful conduct alleged herein was continuous, connected, and on-going

24 since at least July 2014.   The Individual Defendants' misconduct resulted in continuous,

25 connected, and on-going harm to the Company.

26   151.  The Individual Defendants had the power and/or ability to, and did, directly or

27 indirectly control or influence the Company's general affairs, including the content of public

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   statements disseminated by InvenSense and had the power and/or ability directly or indirectly to

2   control or influence one another.

3       152.    Each Individual Defendant is jointly and severally liable to the same extent as any

4   other Defendant is liable for breaches of fiduciary duties as set forth herein or violations of any

5   other laws.

6       153.    As a direct and proximate result of the Individual Defendants' foregoing breaches

7   of fiduciary duties, the Company has suffered significant damages, as alleged herein.

8       154.    Plaintiff, on behalf of InvenSense, has no adequate remedy at law.

9                               **PRAYER FOR RELIEF**

10      WHEREFORE, Plaintiff prays for relief and judgment, as follows:

11      A.      Against all Defendants for the amount of damages sustained by the Company as a

12  result of Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary

13  duties, unjust enrichment, insider selling, and waste of corporate assets;

14      B.      Directing InvenSense to take all necessary actions to reform and improve its

15  corporate governance and internal procedures to comply with applicable laws and to protect

16  InvenSense and its shareholders from a repeat of the damaging events described herein,

17  including, but not limited to, putting forward for shareholder vote resolutions for amendments to

18  the Company's By-Laws or Articles of Incorporation and taking such other action as may be

19  necessary to place before shareholders for a vote the following corporate governance policies:

20      •       a proposal to strengthen the Board's supervision of operations and compliance

21              with applicable state and federal laws and regulations;

22      •       a proposal to strengthen the Company's internal reporting and financial disclosure

23              controls;

24      •       a proposal to de-classify the Company's Board and calling for each director to

25              stand for election to the Board annually;

26      •       a provision to strengthen the Company's oversight and controls over insiders'

27              purchase and sale of Company stock;

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      •      a proposal to develop and implement procedures for greater shareholder input into

2              the policies and guidelines of the Board;

3      •      a provision to permit the shareholders of InvenSense to nominate at least three

4              candidates for election to the Board;

5      •      a proposal to ensure the accuracy of the qualifications of InvenSense's directors,

6              executives and other employees;

7      •      a proposal to strengthen the Company's procedures for the receipt, retention and

8              treatment of complaints received by the Company regarding internal controls; and

9      •      a provision to appropriately test and then strengthen the Company's internal

10             operational control functions;

11      C.      Awarding to InvenSense restitution from Defendants, and each of them, and

12  ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

13      D.      Awarding to Plaintiff the costs and disbursements of the action, including

14  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

15      E.      Granting such other and further relief as the Court deems just and proper

16                        **JURY DEMAND**

17      Plaintiff demands a trial by jury.

18  Dated: January 13, 2015             JOHNSON & WEAVER, LLP
                                          FRANK J. JOHNSON

19                                  NATHAN R. HAMLER

20

21                      By:  *s/Frank J. Johnson*
                                    FRANK J. JOHNSON

22                              110 West "A" Street, Suite 750
                              San Diego, CA 92101

23                              Telephone: (619) 230-0063
                              Facsimile: (619) 255-1856

24                              frankj@johnsonandweaver.com
                              nathanh@johnsonandweaver.com

25

26                              *Attorneys for Plaintiff*

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                            - 44 -

## **VERIFICATION**

I, George E. Rollins, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  January 12, 2015

George E. Rollins
(Signature of George E. Rollins)

- 1